IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 12, 2016

**STATE OF TENNESSEE v. MARCUS LEVY**

**Appeal from the Criminal Court for Shelby County**
**No. 13-04645     Paula Skahan, Judge**

_____

**No. W2015-01081-CCA-R3-CD  -  Filed June 1, 2016**

_____

The defendant, Marcus Levy, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment.  On appeal, the defendant argues that the evidence is insufficient to sustain his conviction and that the trial court erred in allowing the State to enter the witness statements of three witnesses into evidence at trial.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Paul K. Guibao (on appeal) and Mark A. Mesler, II (at trial), Memphis, Tennessee, for the appellant, Marcus Levy.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tracye N. Jones and Chris Scruggs, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted for first degree premeditated murder and employing a firearm during the commission of a dangerous felony[1] arising out of the shooting of the victim, Montrell Xavier Turner, on Carbon Road in Memphis on April 10, 2013.

_____
[1] The court entered a directed verdict dismissing the employment of a firearm charge.

## State's Proof

The victim's mother, Amy Turner, testified that the victim was twenty-six years old at the time of his death. Ms. Turner said that she saw the victim a couple of hours prior to the murder when he briefly stopped by her house. Later that day, a female named "Kissie Boo" called her to say that there was something going on involving the victim. The call lasted seven minutes, and Ms. Turner heard gunshots in the background at the end of the call. Learning that the victim had been shot, Ms. Turner went to the scene, arriving about eight minutes after she heard the gunshots on the telephone call. When she arrived, she saw the victim lying in the street with a gunshot wound to his head. The police and an ambulance were already at the scene, and the victim was transported to the hospital. Ms. Turner also went to the hospital, but she learned that the victim had died when she arrived.

Officer Nate Lenow with the Memphis Police Department testified that he and his partner responded to the scene on April 10, 2013, within minutes of receiving the call that there had been shooting. When they arrived, he saw the victim lying on the ground near the driver's side of his vehicle with a gunshot wound to his head. The victim's vehicle, a red Toyota Corolla, was parked in the middle of the street with the driver's side door open. Twenty-five to thirty people surrounded the officers as Officer Lenow's partner attempted to resuscitate the victim. The scene was chaotic. The officers did not find any guns on the victim or see any guns in his vehicle or on the ground nearby. Two people advised the officers that they were witnesses to the crime. Officer Lenow's report indicated that Latarius Harden told the police that the victim was parked in his car on the scene when the defendant pulled up. Officer Lenow remained on the scene until the investigation of the crime scene was concluded.

On cross-examination Officer Lenow reviewed a photograph of the crime scene that showed an unidentified shiny black object lying next to the victim's leg, although he did not recall seeing anything lying near the victim's body. On redirect examination, Officer Lenow stated that the photograph was not taken by him or his partner and appeared to be taken with someone's cell phone. He said that, had the item in question been a weapon, it would not have been left on the ground and ignored.

Latarius Harden, the victim's cousin, testified that he lived on the street where the victim was killed. On the day of the murder, the victim visited Mr. Harden around 2:30 in the afternoon. Mr. Harden was outside on the porch when the victim walked up through the yard and talked to him for a couple of minutes. The victim had arrived in his red Toyota Corolla with his friend "Quette," who was standing across the street talking to Jackqueline Wimbley. Mr. Harden recalled that, while he and the victim were talking, Mr. Harden saw Terrell Todd at the house next door to his, behind a shed, brandishing a

2

handgun.  No one said anything to Mr. Todd, and the victim got into his car and drove away with "Quette."

Mr. Harden testified that the victim returned about ten or fifteen minutes later.  In the meantime, a "commotion" erupted in his house between Mr. Harden's sister, Terracia Harden, and the defendant's mother, Tangela Levy.  As an aside, Mr. Harden noted that the defendant's grandmother resided on the same street, next door to the house where he had earlier seen Terrell Todd.  The argument between Terracia Harden and Tangela Levy lasted a couple of minutes, and then Ms. Levy exited the house and went across the street to Ms. Wimbley's house.  At some point, Ms. Levy commented that "they should have killed him when he was first down here."  Mr. Harden understood that Ms. Levy was referring to the victim.

Mr. Harden testified that the defendant arrived at the scene around 3:00 p.m. driving a white Jaguar and with one other person in the car.  The defendant parked in the middle of the street in front of Ms. Wimbley's house.  He opened his trunk and removed an assault rifle.  The defendant also had a bulletproof vest, which he did not put on, and a handgun.  The defendant handed the assault rifle to his passenger, who was sitting in the backseat.  About "a couple of seconds" later, the victim drove back to the scene, and the defendant pointed his handgun at the victim as he approached.  The victim parked his car behind the defendant's car and got out of his car with his hands up.  The defendant shot the victim in the head, and the victim fell to the ground.  The victim and the defendant were only three or four feet apart.  The defendant went to the passenger side of his vehicle, and an individual known as "Grease," who had been standing in the vicinity with a handgun, got into the driver's seat and drove away.  Terrell Todd shot into the air twice after the defendant's car left the scene.  Several people were present, but no one took anything from the victim or from the area around his body.  At no point during the altercation did Mr. Harden see the victim with anything in his hands.

Mr. Harden testified that he knew the defendant because one of his sisters had a child with the defendant's brother.  Mr. Harden told the police what he had observed and identified Terrell Todd, "Grease," and the defendant from photographic arrays.  Mr. Harden stated that he was aware that some months prior to the shooting, the defendant believed that the victim had set him up to be robbed.  However, he thought that the two of them had resolved their problems because they had met and spoken since that time.  The victim had not been in town when the robbery occurred and had explained that to the defendant.

Terracia Harden, the sister of Latarius Harden, testified that her sister and the defendant's brother have a child together.  Ms. Harden lived with her brother and mother on the street where the victim was killed.  She recalled that the day of the murder, the

3

victim stopped by the house and she went outside to say hello. While outside, she noticed Terrell Todd standing behind a nearby shed with a gun. Ms. Harden's mother walked the victim to his car as a precaution due to Mr. Todd's being nearby with a gun. About fifteen minutes later, Ms. Harden was inside the house when her brother beat on the door saying, "He just killed Gutta." Ms. Harden elaborated that "Gutta" was the victim's nickname. She rushed outside and saw the defendant leaving the victim's body and getting into the passenger side of his white Jaguar. Someone Ms. Harden knew as "Jaybo" was driving the defendant's vehicle. She did not see the defendant with a gun or see anyone take anything from the victim's body.

Tarkisia Malone, also known as "Kissie Boo," testified that she was related to both the victim and the defendant, in that the victim was her cousin and the defendant's brother was the father of her child. Earlier in the day of the incident, Ms. Malone was getting out of the bathtub when she heard a commotion outside. She went out to see her mother and Tangela Levy, the defendant's mother, arguing about Ms. Malone's son going to visit at Ms. Levy's home. Ms. Malone also argued with Ms. Levy briefly. Ms. Malone then called the victim's mother to warn the victim to stay in the house because there was a "commotion" over him in the neighborhood. While she was on the phone with the victim's mother, Ms. Malone heard a gunshot. She looked out her window and saw the defendant get into the passenger side of his white Jaguar and leave. Ms. Malone called the police and went outside. No one took anything from the victim's body or the vicinity around it, and there were no weapons nearby.

Terrell Todd, whom the State described as an uncooperative witness, testified that he was not on Carbon Road on the day of the murder or that he knew where Carbon Road was located. He denied that he knew anyone in the Harden family, Jackqueline Wimbley, Marquette Britton, "Draylar," "Grease," "Jaybo," or "Rat." He denied seeing the defendant on Carbon Road on the day of the murder or knowing the victim. Mr. Todd claimed to not remember going to the police station a couple of days after the murder and speaking with the police. He said that he had "been on drugs and stuff, and I don't know what I said." He acknowledged that he signed an advice of rights form and provided a statement. However, he claimed that he lied when he told the police that he was present during the shooting because they threatened him.

According to his statement, Mr. Todd initially told the police that when he drove up to the scene, he saw the defendant and the victim arguing "in each other's face" by the victim's car door. He saw the defendant shoot the victim in the face. He said that when the victim "dropped," "Marquette" was in front of the victim's car and pointed his gun at Mr. Todd. Mr. Todd said that he shot at "Marquette" three times before jumping into his car and leaving. At trial, Mr. Todd claimed that he only said these things to the officers

because he was in fear for his life and because the police told him that he would go to jail if he did not cooperate. He further claimed that he did not have a weapon that day.

Mr. Todd denied telling the police in his statement that the victim was in a red Chrysler Sebring, although he remembered that the defendant was in a white car. He acknowledged that he told the police the defendant had a chrome handgun that was not a revolver, but he did not know if that was true. He claimed he did not remember telling the police he never saw the victim with a gun. He also claimed he did not recall telling the police the defendant and the victim were face-to-face when the defendant shot the victim. Mr. Todd denied telling the police the defendant was the person responsible for the shooting of the victim. Mr. Todd did not recall if he was under the influence when he gave the statement.

Because of Mr. Todd's uncooperative testimony, the State sought to have his statement entered into evidence as substantive evidence. The court held a jury-out hearing in which Sergeant Marcus Berryman with the Memphis Police Department testified concerning the circumstances of Mr. Todd's statement. The court determined that Mr. Todd's statement was made under circumstances indicating trustworthiness and ruled that the statement could be entered as substantive evidence.

In front of the jury, Sergeant Berryman testified that Mr. Todd was arrested at 11:10 p.m. on April 12, 2013, as a person of interest in the murder because he was seen at the scene firing a weapon. Sergeant Berryman advised Mr. Todd of his rights, and Mr. Todd signed a waiver of his rights. Mr. Todd advised that he had taken a Percocet at 4:00 p.m. but that he was not feeling the effects of it when he was interviewed at 11:24 p.m. Sergeant Berryman recalled that at no point did Mr. Todd appear to not understand his rights or what was going on. Sergeant Wilkie was also present during the interview. Sergeant Berryman confirmed that they did not threaten Mr. Todd, make any promises of leniency, or tell him what to say. Mr. Todd was not handcuffed, nor did he indicate that he did not want to speak with the police. The interview lasted approximately one hour. Mr. Todd reviewed his statement before signing it and then was free to go, having not been charged with any crime.

Jackqueline Wimbley testified that she lived on Carbon Road at the time of the murder and was familiar with the Harden family and the defendant's family. Ms. Wimbley recalled the day of April 10, 2013, because the victim was killed that day. She said she knew of the victim but did not know him personally. After the victim's murder, the police came to Ms. Wimbley's house to talk to her. She gave a recorded interview and signed a written statement. On the day of the shooting, Ms. Wimbley saw the victim visiting his aunt on her porch across the street. The victim was accompanied by Marquette Britton, who visited with Ms. Wimbley on her porch. Ms. Wimbley heard the

5

victim, Terracia Harden, and someone else raise their voices. While that was going on, Tangela Levy came down the street and went to the Hardens' house. It appeared to Ms. Wimbley that Ms. Levy and Terracia Harden then argued about a shooting that had occurred. The victim walked down the driveway as Marquavius Levy, the defendant's brother, was coming down the street and they exchanged words. The victim pushed Marquavius Levy, then the two separated and the victim drove away.

Ms. Wimbley denied seeing the defendant at the scene in his white Jaguar on the day of the shooting, although she acknowledged to having given the police a statement that she had seen him. Ms. Wimbley claimed that she did not see the defendant on Carbon Road and that she did not see him shoot the victim. Ms. Wimbley admitted that she had known the defendant since he was a child and that she was close to his family. She also admitted that she had been in communication with the defendant's family since the shooting. Ms. Wimbley agreed that she initially told the police that she had witnessed the defendant shoot the victim.

Ms. Wimbley told the police that the victim exited his car with his hands up in the air and asked the defendant, "Marcus, what's all this about? And you got guns. You going to kill me," before the defendant shot the victim in the head and drove away. However, at trial, Ms. Wimbley claimed the information she provided the police was based on hearsay and not her actual observations, even though she did not tell the police that the information she provided was based on hearsay. Ms. Wimbley acknowledged she told the police the victim did not have a weapon, but she claimed at trial she had not seen the victim at the time of the shooting. At trial, Ms. Wimbley identified her signature on her statement to police and her photographic identification of the defendant in which she identified him as the shooter. Ms. Wimbley acknowledged that she saw Terrell Todd "up the street" on the day of the shooting. Ms. Wimbley gave her statement to police almost three months after the shooting. She told them she had not talked to them on the day of the shooting because she did not want to get involved.

Because of the inconsistencies in Ms. Wimbley's testimony at trial and her prior statement, the State sought to have her statement entered as substantive evidence. The court held a jury-out hearing in which Sergeant Berryman testified concerning the circumstances of Ms. Wimbley's statement. The court determined that Ms. Wimbley's statement was made under circumstances indicating trustworthiness and ruled that the statement could be entered as substantive evidence.

In front of the jury, Sergeant Berryman testified that his initial contact with Ms. Wimbley occurred after he knocked on her door while canvassing the neighborhood for information about the murder. Sometime later, Sergeant Berryman took a recorded statement from Ms. Wimbley. The recording was transcribed word-for-word, and Ms.

Wimbley signed the typed statement. Ms. Wimbley told Sergeant Berryman that she personally witnessed the defendant shoot the victim in the head with a small handgun while the victim's hands were in the air.

Sergeant Andrew Hurst with the Memphis Police Department testified that he was present when Ms. Wimbley signed the typed statement. He recalled that the statement initially contained the incorrect date, and Ms. Wimbley corrected and initialed it. Sergeant Hurst also showed Ms. Wimbley the photographic array from which she identified the defendant.

Dr. Erica Curry, an expert witness in forensic pathology, performed the autopsy on the victim. Dr. Curry determined that the victim's cause of death was a single, close-range gunshot to the head.

Draylar Lanier, Ms. Wimbley's adult daughter, acknowledged she did not want to testify. Ms. Lanier stated she had known the victim for five or six years and had known the defendant her entire life. Ms. Lanier admitted she gave a statement to the police regarding the victim's murder; however, she claimed she did not recall what she had said in her statement because she was on Xanax.

Ms. Lanier testified that she lived on Carbon Road at the time of the murder. A friend dropped her off that day in front of the Hardens' house, and she remained by the car socializing. Ms. Lanier saw Tangela Levy and Terracia Harden arguing in the Hardens' living room. After they stopped arguing, Ms. Levy went to Ms. Lanier's house and spoke with Ms. Lanier's grandmother. While Ms. Levy was talking to Ms. Lanier's grandmother, the defendant arrived in his white car and parked close to where Ms. Lanier was standing. Ms. Lanier told the defendant that he "need[ed] to leave it alone." Asked if her statement to the police refreshed her memory regarding what happened after she told the defendant to "leave it alone," Ms. Lanier said that she was under the influence of Xanax at the time of the murder. Ms. Lanier could not remember several details concerning the victim's murder and said that her statement did not refresh her memory. She did not pay attention to whether the defendant had a gun. She did not remember what occurred when the victim arrived. She heard a gunshot but did not see what happened. She did not remember saying anything to the defendant after the shooting. Ms. Lanier admitted that members of the defendant's family visited her at her mother's house the day before she testified. Ms. Lanier claimed that the police forced her to give a statement. With regard to her statement, Ms. Lanier said, "Some part[s] might be a lie. Some part[s] might be . . . true."

Because of the inconsistencies in Ms. Lanier's testimony at trial and her prior statement, the State sought to have her statement entered as substantive evidence. The

court held a jury-out hearing in which Sergeant Robert Wilkie of the Memphis Police Department testified concerning the circumstances of Ms. Lanier's statement. The court determined that Ms. Lanier's statement was made under circumstances indicating trustworthiness and ruled that the statement was admissible as substantive evidence.

In front of the jury, Sergeant Wilkie testified that he took a statement from Ms. Lanier. He did not bribe Ms. Lanier in any way to give a statement. Ms. Lanier verified in her statement that she was not under the influence of any drug, medication, or alcohol and that the statement was given voluntarily without any threats or promises. Ms. Lanier told Sergeant Wilkie that she had known the victim for thirteen years. Ms. Lanier recalled that when the defendant arrived to the scene, she told him "he needed to 'leave this stuff alone.'" However, the defendant, who was holding a pistol, told his mother, who was standing nearby, that "he was going to 'shoot that ni**er in the face.'" The defendant walked to his trunk and pulled out "two choppers." At that time, the victim pulled up, and the defendant put the "choppers" back into the trunk. The victim got out of his car with his hands in the air, holding his cell phone. The two exchanged words, and the defendant shot the victim in the head. Ms. Lanier asked the defendant why he did that, but the defendant rode off in his car with his friend "Jaybo" driving. In the course of her statement, Ms. Lanier told Sergeant Wilkie that she spoke to the defendant the day before he turned himself in, and the defendant had asked her to testify on his behalf because "it was going to be . . . his word against theirs." Ms. Lanier said that she hung up the phone on him. Sergeant Wilkie stated that he took Ms. Lanier's statement approximately thirty days after the incident.

The remaining witnesses for the State were members of law enforcement who either worked the crime scene or analyzed the evidence in the case. Officer Hope Smith, a crime scene investigator with the Memphis Police Department, described the scene of the crime, how it was processed, and the evidence that was retrieved. Among the evidence collected was a spent nine-millimeter casing, a blue and gray baseball cap, and a pack of cigars. The victim's car engine was still running, and the driver's door was open when the crime scene officers arrived. Officer Jason Parish, another crime scene investigator with the Memphis Police Department, processed the victim's vehicle at their facility. A loaded assault rifle was located hidden in the spare tire storage compartment of the trunk. No other weapon or ammunition was discovered in the car. Tennessee Bureau of Investigation Agent Eric Warren, an expert in firearms examination, analyzed, among other things, the bullet that was recovered from the victim's body.

**Defendant's Proof**

The defendant testified that he knew the victim through "business," as they were both involved in selling drugs. The defendant's grandmother and uncles lived on Carbon

8

Road, as did Maurice Reed, who was also known as "Grease." About a month before the murder, the defendant was robbed by several individuals, including the victim. He did not file a police report, and he and the victim "squashed the situation" a couple of weeks later.

The defendant testified that, the night before the murder, the victim and at least one other person conducted a drive-by shooting of the defendant and some of his comrades. No one was injured, and the police were not called. On the day of the murder, the defendant went to Carbon Road to see what was going on in the neighborhood. He saw several people standing around and stopped to see what was happening. He denied that there was anyone with him. The defendant spoke with his mother and learned that the victim had just left after making threats. The defendant claimed that he told his mother that they should move to Atlanta. About that time, the victim drove up in his red car and parked behind the defendant's car. The victim jumped out of his car with a gun, and the defendant grabbed his mother and pushed her out of the way. The victim threatened him, so the defendant pulled out his gun and shot the victim. The defendant got into his car and left the scene. He turned himself into the police eight days later. He denied that he had any automatic rifles.

Maurice Reed testified that he was at his grandmother's house on Carbon Road the night before the murder and had, along with the defendant and some others, been shot at by the victim in a drive-by shooting. No one in Mr. Reed's group shot back. Mr. Reed said that he was also at his grandmother's house the afternoon of the shooting. He saw the victim drive up to the Hardens' house and visit briefly before leaving. About twenty minutes later, the defendant arrived in the area and talked to various people on the street. The victim returned and jumped out of his car with a gun. Everyone told the victim to leave. Mr. Reed claimed that he went back into the house, at which point he heard a gunshot, but did not see what had occurred. Mr. Reed acknowledged that he had been lifelong friends with the defendant and his family. Mr. Reed said he gave a statement to the police on April 12, 2013, but denied telling the police that the defendant shot the victim.

Following the conclusion of the proof, the jury convicted the defendant, as charged, of first degree premeditated murder.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first argues that the evidence is insufficient to convict him of first degree premeditated murder. The defendant asserts that the proof did not rise to the level

of showing that the killing was premeditated and intentional and that his conviction was "in large part" based upon the "questionable testimony" of Terrell Todd, Jackqueline Wimbley, and Draylar Lanier who "recanted in whole or in part their previous statements regarding the involvement of the [defendant]."

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree murder, defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused

10

for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

In the light most favorable to the State, the evidence shows that the defendant shot the unarmed victim in the head from a close distance while the victim held his hands in the air. As a possible motive for the murder, the defendant admitted that he and the victim had recently experienced problems with each other, in that he believed the victim had robbed him one month prior to the murder and conducted a drive-by shooting at him the night before the murder. As evidence of the defendant's intent to kill, according to one of the witnesses' statements, the defendant was heard saying to his mother that he was going to shoot the victim in the face. The defendant's calm demeanor immediately before the shooting further supports a finding of premeditation. The defendant was seen opening his trunk and briefly pulling out an assault rifle. The victim arrived, and the defendant pointed a gun at him as he approached. The victim exited his car with his hands up in the air, and the defendant shot him and then fled the scene. Again, whether premeditation exists is a question of fact to be determined by the jury. The evidence is sufficient for a rational trier of fact to determine that the defendant premeditated the killing.

As to the defendant's assertion that his conviction was "in large part" based upon the "questionable testimony" of Terrell Todd, Jackqueline Wimbley, and Draylar Lanier who "recanted in whole or in part their previous statements regarding the involvement of

11

the [defendant]," and there was no proof showing "any communication from the [defendant] with these witnesses," the evidence indicates otherwise. Ms. Wimbley admitted that she had communicated with the defendant since the shooting. Ms. Lanier admitted that members of the defendant's family had visited her at her mother's house the day before she testified and that, when the defendant called her before turning himself in, he asked her to testify in his defense because it would be "his word against theirs." By its verdict, the jury accredited the original statements of the three witnesses who later recanted. Furthermore, Latarius Harden never equivocated on his testimony that he had personally witnessed the defendant shoot the unarmed victim while the victim held his hands in the air, which was consistent with the three witnesses' original statements.

## II. Witness Statements

The defendant also argues that the trial court erred in allowing the State to enter the witness statements of Terrell Todd, Jackqueline Wimbley, and Draylar Lanier into evidence at trial. He asserts that "there is significant doubt as to the trustworthy nature" of the witnesses' prior statements and that the cumulative error of admitting all three statements "unjustly and severely prejudiced the outcome" of his case. Thus, the defendant's argument on appeal focuses on the trustworthy nature of the three witnesses' prior statements, not on any claim that the witnesses' testimony at trial was not "inconsistent" with his or her prior statement.

The defendant specifically claims that Mr. Todd's statement was untrustworthy because he said he had been taking drugs, the police had threatened him into making the statement, and Mr. Todd was questioned as to his actual involvement due to the claim that he had a weapon. Ms. Lanier claimed that she was taking Xanax at the time of her statement and that the police forced her to give the statement. Ms. Wimbley testified that her statement was not accurate and that most of the information was learned from other people.

Tennessee Rule of Evidence 803(26), "Prior Inconsistent Statements of a Testifying Witness," provides that a witness's prior statement is admissible as substantive evidence if it is otherwise admissible under Rule 613(b) and if all the following conditions are satisfied:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) (2015). Tennessee Rule of Evidence 613(b) provides in pertinent part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." "[F]or the purposes of Tennessee Rule of Evidence 803(26), a prior statement about events that a witness claims at trial to be unable to remember is 'inconsistent' with the witness' trial testimony." State v. Davis, 466 S.W.3d 49, 64 (Tenn. 2015).

The trial court conducted jury-out hearings before admitting the statements of any of the witnesses. In the jury-out hearing regarding Mr. Todd's statement, Sergeant Berryman testified that Mr. Todd was advised of and waived his rights. He confirmed that Mr. Todd was not handcuffed and never indicated that he did not want to speak with the police. The officers did not threaten Mr. Todd, make any promises of leniency, or tell him what to say. Mr. Todd advised the officers that he had taken a Percocet earlier that afternoon but that he was not feeling the effects of it when he was interviewed more than seven hours later. Sergeant Berryman recalled that at no point did Mr. Todd appear to not understand his rights or what was going on. Mr. Todd reviewed his statement before signing it and then was free to go. Based upon these circumstances, the trial court determined that Mr. Todd was "extremely uncooperative" in testifying at trial and that the circumstances surrounding his statement carried indicia of trustworthiness. The court specifically found that Sergeant Berryman's testimony was more credible than Mr. Todd's.

In the jury-out hearing regarding Ms. Lanier's statement, Sergeant Wilkie testified that Ms. Lanier was not restrained during her statement, and the police did not make any threats or promises in exchange for her statement. He did not tell her how to respond to the questions. She did not appear to be under the influence of any drugs, alcohol or medication, and she advised that she was not. Ms. Lanier reviewed her statement before signing it. Based upon these circumstances, the trial court determined that Ms. Lanier's prior statement was inconsistent with her testimony in court and that the circumstances surrounding her statement carried indicia of trustworthiness.

In the jury-out hearing regarding Ms. Wimbley's statement, Sergeant Berryman testified that he initially came into contact with Ms. Wimbley when he was canvassing the neighborhood, and he asked her if she saw what had happened. Ms. Wimbley agreed to provide a recorded statement, and Sergeant Berryman asked her questions about what

13

she personally saw. Ms. Wimbley signed the written statement after reviewing it for accuracy. Based upon these circumstances, the trial court determined that Ms. Wimbley's prior statement was inconsistent with her testimony in court and that the circumstances surrounding her statement carried indicia of trustworthiness.

We conclude that the trial court properly admitted the statements after following appropriate procedures. All of the witnesses' statements were redacted to reflect only the information he or she was questioned about during trial and/or to remove hearsay. In addition, in light of our conclusion that the trial court did not err in admitting any of the witnesses' statements, we respectfully disagree with the defendant's assertion that he is entitled to relief based on cumulative error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE